IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. DLB-20-293 |
| | * | |
| DOMINIQUE EMANUEL BELL, | * | |
| | * | |
| Defendant | * | |
| | * | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The Defendant, Dominique Emanuel Bell, comes before this Court having been convicted, via a Superseding Information of in Count One, with Interstate Transportation for Purposes of Prostitution, in violation of 18 U.S.C. § 2421(a), and, in Counts Two and Three, with Coercion and Enticement, in violation of 18 U.S.C. § 2422(a)—during which crimes he repeatedly used, drugged, coerced, and abused women for his personal gain.

For the reasons stated herein, the United States requests that the Court sentence the Defendant to a term of imprisonment of 8 years (96 months), followed by a lifetime of supervised release, and special assessments as set forth in the statute. Such a sentence is sufficient but not greater than necessary to reflect the gravity of the defendant's conduct and to meet the other 18 U.S.C. § 3553(a) sentencing factors.

I.   BACKROUND

Between August 2018 and May 2019, at various times, the Defendant, Dominique Emanuel Bell coerced, threatened, enticed, and facilitated the participation of Victim 1, Victim 2, and Victim 3 in prostitution activity, including "outcall" activity in Maryland, the District of Columbia, and Virginia.

A.   *Victim 1*

Between August 2018 and November 2018, the Defendant recruited, enticed, harbored,

1

transported, provided, and maintained Victim 1, an adult, knowing that means of force, threats of force, and coercion would be used to cause Victim 1 to engage in commercial sex acts.

In August 2018, the Defendant had recently been released from a halfway house following a prior 2012 conviction in Washington, D.C., for Pandering of a Minor and for which he had been sentenced to 84 months of incarceration. The Defendant had previously trafficked Victim 1 (as an adult) as part of the conduct underlying his 2012 conviction, and he had been in contact with Victim 1 during his prison term. Victim 1 knew the Defendant as "Staks" and had a tattoo of a stack of money placed on her face in reference to that nickname.

The Defendant approached Victim 1 after his release from the halfway house and recruited her to work for him again performing sex acts for customers in exchange for money. In or about August and into September 2018, Victim 1 worked at a restaurant in Capitol Heights, Maryland. The Defendant pressured Victim 1 to leave her job at the restaurant and to work as a prostitute. Victim 1 did leave her job and went to live with the Defendant.

During the period from September 2018 through at least November 2018, the Defendant enticed, harbored, transported, and maintained Victim 1 as she engaged in commercial sex trafficking. The Defendant paid for a rental car (rented in the name of another individual) that he used to transport Victim 1 to "outcall" dates in Maryland, Washington, D.C., and Virginia. The rental car company was in College Park, Maryland. The Defendant paid for the rental car (a blue Impala) both in cash and using the CashApp Internet application. At times from October 20, 2018 through November 3, 2018, Victim 1 would pay for a hotel room at a hotel in College Park, Maryland, and provide money to the Defendant from proceeds earned from commercial sex customers. Cellular location data show that the phones used by the Defendant and Victim 1, respectively, were both located in the vicinity of the hotel in College Park from October 20, 2018

to October 31, 2018.  From November 9, 2018, through November 26, 2018, the Defendant paid for a hotel room in his own name at the same hotel in College Park, Maryland.  Victim 1 stayed in the hotel room and engaged in sex acts in return for money and provided that money to the Defendant.

CashApp records demonstrate that on multiple occasions, Victim 1 would receive money from commercial sex customers in even-dollar amounts, and then, soon thereafter, would send similar amounts to the Defendant in slightly smaller amounts.  For example, on October 6, 2018, Victim 1 received $80.00 from a customer and within an hour sent $79.47 to the Defendant.  On October 21, 2018, Victim 1 received $60.00 from a customer and within 15 minutes sent $58.83 to the Defendant.  Similar pairs of payments occurred on October 28, 2018 ($100 received and $97.25 sent to the Defendant), November 19, 2018 ($50.00 received and $49.00 sent to the Defendant), and November 21, 2018 ($100 received and $98.02 sent to the Defendant).

Text messages between the Defendant and Victim 1 show that the Defendant monitored and managed Victim 1 as she performed sex acts in exchange for money.  For example, on November 24, 2018, Victim 1 informed the Defendant that a customer has arrived: "He here."  Approximately an hour later, the Defendant inquired "Ok how much was it?" and "He been there an hour."  Later that same day, the Defendant asked whether advertisements posted for Victim 1 are getting responses ("R ppl hittin?") and then announces his intention of doing intense business in the next week ("Aite this next week we really got A go hard").  Still later that same day, the Defendant sent a text regarding an "outcall," that is, an appointment with a sex customer at a location other than the hotel: "Pulled up outside might have an outcall u gun giv me sum head b4 I leave."

The Defendant sent Victim 1 texts meant to coerce or threaten Victim 1.  For example, at

3

approximately 2:40 a.m. on November 25, 2018, the Defendant asked Victim 1 if she needed more of a drug: "Do u need more Molly?" He then instructed Victim 1 to "Cum get it," and tells her "We got oc," where "oc" is a reference to an outcall. Later the same day, the Defendant sent the following sequence of texts within a seven minute period to urge Victim 1 to service a customer:

- [Victim 1] u betta get ur attitude right
- IM not play in with u
- And yo ass betta not b sleep when I call
- U been nappin 4eva
- Dude saying he here
- Wait
- He stopped responding

Continuing later on November 25, 2018, the Defendant again sent texts directing prostitution activities. For example, he directed Victim 1 to "Hit ur regulars b what we can scrape we trapping 2day." In another specific instance, the Defendant informed Victim 1 of interest by a customer: "its another [N-word] want an in call said he 3 mins away he sent a pic of the gps."

At various times during the period between early September 2018 and late November 2018, the Defendant used force, threats of force, and coercion, to cause Victim 1 to engage in commercial sex acts. On at least one occasion, the Defendant struck Victim 1 directly. On another occasion in November 2018, the Defendant smashed Victim 1's head into a mirror in a hotel room.

B. *Victim 2*

On April 21, 2019, the Defendant contacted Victim 2, an adult female, over a text application and told her that he had a date set up for her in Maryland. He told her that a guy would pay to see the Defendant and Victim 2 perform a sex act. The Defendant agreed to give her a share of the money. He said he would send an Uber or Lyft to her location in DC, and he did so. Victim 2 took the car service to the motel in College Park, Maryland. Information from Victim 2's phone confirm that a car service was sent to bring her to Maryland. The Defendant intended that Victim

2 would engage in sex acts for money when she arrived in Maryland.

When Victim 2 arrived, the Defendant and another male brought her up to a room and gave her alcohol, heroin, and cocaine. Victim 2 became intoxicated. The Defendant took her phone and began posting online advertisements. Victim 2 provided sex acts in exchange for money in the motel room that had been rented by the Defendant.

On April 22, 2019, the Defendant, using Victim 2's phone and pretending to be Victim 2, exchanged texts with an undercover police officer who set up a prostitution "date" in response to an online advertisement. Via text message, the Defendant directed the undercover police officer to the room where Victim 2 was performing sex acts in exchange for money.

The Defendant was arrested and, after waiving his *Miranda* rights, interviewed. He admitted providing transportation for Victim 2 to travel from Washington, D.C. to Maryland. He admitted knowing that Victim 2 performed sex acts in exchange for money. The Defendant also admitted paying for the room from which Victim 2 was recovered—a fact confirmed by hotel records.

C. *Victim 3*

On April 22, 2019, in connection with the events relating to Victim 2, the Defendant was taken into custody and detained in Prince George's County. While he was detained, he contacted Victim 3 using the detention center phone system. The calls were recorded. The Defendant directed Victim 3 to get money to pay his bail. He also directed Victim 3 to transport Woman 1 to commercial sex dates. Victim 3 engaged in commercial sex dates in Maryland, Virginia, and Washington, D.C. and also transported Woman 1 to commercial sex dates. Victim 3 and Woman 1 used the money from the commercial sex dates to post bail for the Defendant. At this time, Victim 3 was staying at a residence in Washington, D.C.

In one call, the Defendant asked Victim 3 to commit to providing $300 toward his bail. He insisted that Victim 3 make a commitment. Victim 3 explained that she was driving to a gated community in Virginia and then to Hyattsville for outcalls. He instructed Victim 3 to bring Woman 1 with her to the outcalls. The Defendant informed Victim 3 that, after gathering the necessary money through commercial sex dates, she would need to accompany Woman 1 to sign the bail paperwork because Woman 1 was not yet 21 years old.

In another call, the Defendant threatened Victim 3 and her boyfriend if she did not follow his direction. He told here that if she didn't do what he told her to do, she was going to get her "Southeast card" revoked. He told her that "[y]ou got niggas on high alert." He told her that people were going to hold her responsible if he stayed in jail. The Defendant told Victim 3 that he was going to smack her boyfriend around and that she was wrong to be scared of her boyfriend and not him. He was released by Prince George's County in May 2019 after Victim 3 and Woman 1 posted bail on his behalf.

The Defendant was arrested on a federal arrest warrant in October 2021. After waiving his *Miranda* rights, he was interviewed and admitted knowing Victim 1, Victim 2, and Victim 3 and knowing that each engaged in prostitution.

## II.   The Applicable Guidelines

### A. Total Offense Level

The Government agrees with Probation that the Defendant's Total Offense Level is 31. (ECF No. 101 at ¶ 60.)

### B. Criminal History Category

The Government agrees with Probation that the Defendant's Criminal History Category is IV. (ECF No. 101 at ¶ 72.)

### C. Guidelines Range

Given the above calculations, the Government agrees with Probation that the Defendant's guidelines range is 151-188 months' imprisonment. (ECF No. 101 at ¶ 103.)

### III. Determining a Sentence that is Sufficient, But No Greater Than Necessary, to Achieve the Goals of Sentencing.

A sentencing court must follow the three-step process set forth by *Gall v. United States*. *See* 522 U.S. 38 (2007). First, the court must properly determine the Guideline range. *See id.* at 49 (citing *Rita v. United States*, 551 U.S. 338, 347-48 (2007)). Second, the court must determine whether to apply any of the guidelines' departure policy statements to adjust the Guideline range. *See id.* at 49-50. Third, the court must consider all the factors set forth in 18 U.S.C. § 3553(a) as a whole, including whether a variance—a sentence outside the advisory guideline system—is warranted. *See id.*

The statutory factors for the court's consideration under 18 U.S.C. § 3553(a) include: 1) the nature and circumstances of the offense and history and characteristics of the defendant; 2) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford deterrence, protect the public and provide the defendant with needed services; and 3) the kinds of sentences available and the need to avoid unwarranted sentencing disparities. "In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." U.S.S.G. § 1B1.4; *see also* 18 U.S.C. § 3661. "If the district court decides to impose a sentence outside the guidelines range, it must ensure that its justification supports 'the degree of the variance.'" *United States v. Evans,* 526 F.3d 155, 161 (4th Cir.), *cert. denied,* 555 U.S. 977, 129 S.Ct. 476, 172 L.Ed.2d 341 (2008) (quoting *Gall,* 552 U.S. at 51). The

district court is given "some latitude," and "a degree of deference," to tailor a particular sentence to the circumstances. *United States v. Green,* 436 F.3d 449, 456-57 (4th Cir. 2006); *United States v. Moreland,* 437 F.3d 424, 433 (4th Cir. 2006).

    A.    *18 U.S.C. § 3553 Considerations*

To determine the appropriate sentence, the Court must consult both the Guidelines and the factors set forth in 18 U.S.C. § 3553(a). Although they are advisory, "a sentencing court is still required to 'consult [the] Guidelines and take them into account when sentencing.'" *United States v. Clark,* 434 F.3d 684, 685 (4th Cir. 2006) (quoting *United States v. Booker,* 543 U.S. 220, 264 (2005)). Thus, a sentencing court must first calculate the applicable Guidelines range after making the appropriate findings of fact. *United States v. Hughes,* 401 F.3d 540, 546 (4th Cir. 2005). Relying on that range as "the starting point and the initial benchmark," the sentencing court must then "consider all of the § 3553(a) factors" before imposing a sentence. *Gall v. United States,* 552 U.S. 38, 49-50 (2007).

    B.    *The 18 U.S.C. § 3553(a) Sentencing Factors Warrant a 96 Month Sentence*

In this case, careful consideration of the § 3553(a) factors confirms that the correctly a total term of 96 months—followed by lifetime supervised release, and the special assessments is the appropriate sentence for this repeat offender.

    i.    <u>The Nature and Circumstance of the Offenses</u>

The repeated sexual and physical abuse of women for selfish and personal gain is a very serious, abhorrent, and reprehensible crime. The facts, as agreed to by the parties, lays bare the actions of an individual whose callous disregard for his victims is readily apparent and repetitive. Plied with heroin, or cocaine, "molly", or alcohol—or the promise of money or security—he forced or coerced his victims to engage in sex acts with himself, or with others in

exchange for money. He threatened them and physically assaulted them when he wanted, including smashing Victim 1's head into a mirror. Through fear and coercion, he dictated their acts and personally profited from it. The nature and circumstances warrant a significant sentence.

      ii.    <u>The History and Characteristics of the Defendant and the Need for the Sentence to Reflect the Seriousness of the Offenses, Promote Respect for the Law, and Provide Just Punishment</u>

The defendant is a repeat offender who has demonstrated that very he has had no desire to stop committing criminal acts and therefore a lengthy sentence is required. He unfortunately has a lengthy criminal history that dates back approximately 15 years. Amongst other things, he has been convicted of Conspiracy to Commit Robbery with a Deadly Weapon, Prostitution, and Pandering a Minor. (ECF No. 101 at ¶¶ 65-69.) For this last conviction he received a sentence of 84 months. This is not a case before the Court of a first offender or of someone unfamiliar with the Courts and the consequences he could face for committing crimes. He knew the consequences yet decided to engage in the criminal acts that brings him before the Court, yet again. Again, he targeted vulnerable women—using an array of abusive and premeditated tactics to get the victims to do his bidding. He exploited their vulnerabilities, through drugs, threats, mind-games, and abuse. The sentence must reflect the seriousness of the acts committed by the Defendant and his repeat offender status.

      iii.    <u>The Need to Afford Adequate Deterrence to Criminal Conduct, to Protect the Public from Further Crimes of the Defendant, and to Provide the Defendant with Treatment</u>

The Defendant must be deterred. It is unfortunate and frankly baffling that the previous periods of incarceration were not a sufficient deterrent to prevent the Defendant from engaging in further crime. Once he was released from his previous stint for Pandering of a Minor, he went right back to a life of crime. His criminal conduct has spanned years. He

even had the temerity to coerce his victims into getting him out of jail during the timeframe of the facts of this case so that he could ostensibly continue to commit crimes. The level of control that he exhibited over the victims is striking and needs to be stopped. He was aware of the illegality of his conduct. He was explicitly shown, via convictions and prison sentences, that he should stop. None of this deterred him. Instead, he mocked the criminal justice system by flagrantly and persistently committing crimes. If the Defendant is unable or unwilling to conform his behavior to the dictates of an orderly and peaceful society, then the public must be protected via a sentence that would, at least, help guarantee the safety of the public from any further criminal actions during that period of imprisonment. Being confined would force the Defendant from the public and render him incapable of engaging in crime in the community. Meanwhile, the Defendant, if he chooses, will be able to take advantage of treatment, if necessary, as well as any educational and vocational services that could, hopefully, reduce the risk of recidivism. The sentence in this case must also constitute a clear message to any potential offenders contemplating similar actions, that severe consequences will result from such reprehensible acts. "Nor does the fact that [the defendant] will be subject to restrictions and supervised release [if] he gets out of prison offer any guarantee that he will not commit any crimes." *See Irey,* 612 F.3d at 1215 (discussing studies and other data showing that "supervised release ... often fails to prevent sex offender recidivism"). In short, "[s]upervised release is better than unsupervised release, but it does not offer society the level of protection from a convicted criminal that incarceration does." *Id.* at 1216. A 96-month sentence is therefore warranted.

## IV. Supervised Release

The Court must also determine the appropriate term of supervised release at sentencing. "Supervised release ... is not a punishment in lieu of incarceration." *United States v. Granderson,* 511 U.S. 39, 50 (1994). Instead, it "fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson,* 529 U.S. 53, 59 (2000). Under 18 U.S.C. § 3583(k), the authorized term of supervised release for the defendant's offense is at least five years and up to life. This five-year mandatory minimum term reflects a heightened concern for recidivism among sex offenders and the need for supervision over time. *See, e.g.,* H.R. Rep. No. 107-527, at 2 (2002) (explaining that "studies have shown that sex offenders are four times more likely than other violent criminals to recommit their crimes" and that "the recidivism rates do not appreciably decline as offenders age"). Notably, the Guidelines recommend a lifetime term of supervised release for sex offenders, U.S.S.G. § 5Dl.2(b) (Policy Statement), and the Fourth Circuit has observed that § 3583(k) and § 5D1.2(b) jointly "reflect[] the judgment of Congress and the Sentencing Commission that a lifetime term of supervised release is appropriate for sex offenders in order to protect the public." *United States v. Morace,* 594 F.3d 340, 351 (4th Cir. 2010) (citations omitted). Based on an assessment of these factors, the United States requests that the Court impose a lifetime of supervised release with the conditions of supervision described in the PSR. Given the defendant's continued criminal behavior a lifetime term of supervision is the only effective means to mitigate as much as possible the risk that he will reoffend when he is released into the community.

## V. Conclusion

The defendant is a repeat offender who coerced and abused women for his desires. He has not been deterred by previous convictions and periods of incarceration. For the reasons

11

stated herein, the United States respectfully requests that the Court impose a sentence of 96 months, a lifetime of supervised release, a $5,000 special assessment under 18 U.S.C.§ 3014 (if not deemed indigent), and a $100 special assessment under 18 U.S.C. § 3013 for each count of conviction.

                                            Respectfully submitted,

                                            EREK L. BARRON
                                            UNITED STATES ATTORNEY

                                            */s/ G. Michael Morgan, Jr.*    Digitally signed by GARY MORGAN
                                            _____    Date: 2023.10.18 00:01:32 -04'00'
                                            G. MICHAEL MORGAN, JR.
                                            Assistant United States Attorney

**CERTIFICATE OF SERVICE**

      I hereby certify that on October 17, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing ("NEF") to counsel of record in this case.

      Respectfully submitted,

      /s/
      G. MICHAEL MORGAN, JR.
      Assistant United States Attorney